T.C. Memo. 1997-575


UNITED STATES TAX COURT


VARIETY CLUB TENT NO. 6 CHARITIES, INC., Petitioner $\underline{v}$.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 9045-90.                    Filed December 31, 1997.


        Petitioner was incorporated in 1970 to raise funds for
tax-exempt charitable organizations, primarily those
benefiting underprivileged children.  Petitioner received a
favorable ruling letter in 1971.  Much of petitioner's
fundraising consisted of operating bingo games.
Petitioner's treasurer (Z) and a member (P) were delegated
to supervise and operate the bingo games, respectively.  Z
and P falsified records of the bingo games operations and
stole some of the proceeds.  In fiscal 1986 petitioner was
indicted for violation of Ohio statutes authorizing
charities to conduct bingo games; petitioner paid an
attorney to represent it and Z.  In fiscal 1987 local law
enforcement authorities brought a civil suit against
petitioner, Z, P, and another, on account of these bingo
games; one attorney answered the complaint on behalf of all
the defendants.  In fiscal 1985 petitioner issued a $2,500
check to a tax-exempt charity for a specific project; the
charity decided not to engage in that project, endorsed the
check, and gave it to P; P then diverted the check instead

of returning it to petitioner. In fiscal 1984 and fiscal 1985 petitioner paid $250 per bingo session rental for a bingo hall to a corporation in which Z and P each held 20-percent ownership interests. In 1990 respondent revoked petitioner's favorable ruling letter, retroactive to the start of fiscal 1984, and determined deficiencies for fiscal 1984, 1985, and 1986.

1. Held: Z and P were "insiders" for purposes of the inurement provisions of sec. 501(c)(3), I.R.C. 1954 and 1986.

2. Held, further, Z's and P's theft of bingo proceeds was not an inurement of petitioner's net earnings.

3. Held, further, petitioner's fiscal 1987 payment to an attorney was not an inurement for purposes of determining petitioner's status for fiscal 1984-1986.

4. Held, further, petitioner's fiscal 1986 payment to an attorney was an inurement to Z, an insider.

5. Held, further, P's diversion of the $2,500 check was essentially a theft and not an inurement of petitioner's net earnings.

6. Held, further, petitioner failed to prove that its $250 per session rental payments for fiscal 1984 and 1985 were not excessive; thus petitioner failed to prove that the payments were not inurements of petitioner's net earnings to Z and P, insiders.

7. Held, further, respondent's 1990 revocation of the favorable ruling letter back to the start of fiscal 1984 was not an abuse of discretion.


Deborah J. Nicastro, for petitioner.

Katherine Lee Wambsgans, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

CHABOT, Judge: Respondent determined deficiencies in Federal corporate income tax against petitioner as follows:

| Year[1] | Deficiency |
|---|---|
| 1984 | $17,957 |
| 1985 | 19,719 |
| 1986 | 3,818 |

[1] Taxable years ending September 30 of each of the years in issue. References in this opinion to petitioner's fiscal years are to years ending on September 30 of the indicated years.

After concessions[1] the issues for decision are as follows:

(1) Whether any part of petitioner's net earnings inured to the benefit of private shareholders or individuals, within the meaning of section 501(c)(3).[2]

---

[1]    Petitioner does not dispute the correctness of respondent's notice of deficiency calculations of the deficiency for any year as to which we hold petitioner was not tax-exempt.

At trial, respondent contended that petitioner was not exempt because petitioner failed the statutory inurement test and also because petitioner failed the test of sec. 1.501(c)(3)-1(c)(2), Income Tax Regs., to the effect that an organization is not operated exclusively for one or more exempt purposes if its net earnings inure in whole or in part to the benefit of private shareholders or individuals. On opening brief, respondent notes the overlap between the two contentions and states that its argument "is confined to private inurement." Thereafter, respondent deals only with the statutory inurement test. We treat this as respondent's abandonment of the regulatory operational test.

[2]    Unless indicated otherwise, all section references are to sections of the Internal Revenue Code of 1954 or the Internal Revenue Code of 1986 as in effect for the period of time referred to.

(2) If the answer to issue (1) is "yes", then whether the retroactive revocation of the favorable ruling letter was an abuse of discretion.

FINDINGS OF FACT

Some of the facts have been stipulated; the stipulation and the stipulated exhibits are incorporated herein by this reference.

When the petition was filed in the instant case, petitioner was an Ohio not-for-profit corporation, and its principal office was in Cleveland, Ohio.

The Variety Club charities were founded in 1936 to raise money for disabled or handicapped children. At the time of the trial, there were about 80 Variety Club tents (chapters) in the United States, Australia, France, Israel, Mexico, and Switzerland.

Petitioner was incorporated in Ohio on December 17, 1970. Variety Club of Northern Ohio Tent No. 6 (hereinafter sometimes referred to as the Club) was originally formed in the late 1930's in northern Ohio to benefit handicapped and disadvantaged children. The Club is an Ohio not-for-profit corporation. Petitioner was organized by the Club for the specific purpose of raising funds from the general public for various activities

including the supporting of Ohio Boys Town and other charities which deal primarily with underprivileged children.  As of the time of the trial in the instant case, Ohio Boys Town was an organization which respondent determined was exempt under section 501(c)(3).

Petitioner applied for a favorable charitable exemption ruling by an application dated January 27, 1971.  In this application petitioner represented that no part of its net income would inure to the benefit of any private shareholder or individual.  To this application petitioner attached a copy of its articles of incorporation, which provide in pertinent part as follows:

>     THIRD:  This Corporation [petitioner] is organized exclusively for charitable, religious, educational and scientific purposes, including, for such purposes, the making of distributions to organizations that qualify as exempt organizations under Section 501(c)(3) of the Internal Revenue Code of 1954 as amended.

>                     *    *    *    *    *    *    *

>     FIFTH:  No part of the net earning of the Corporation shall inure to the benefit of, or be distributable to its members, trustees, officers, or other private persons, except that the Corporation shall be authorized and empowered to pay reasonable compensation for services rendered and to make payments and distributions in furtherance of the purposes set forth in Article THIRD hereof.

Petitioner's articles of incorporation also provide as follows with regard to petitioner's indemnifying its officials for legal expenses:

NINTH:  (A) The Corporation [petitioner] shall indemnify a trustee, officer or employee or a former trustee, officer or employee or any person who is serving or has served at its request as a trustee, director, officer or employee of another corporation (whether nonprofit or for profit) against expenses actually and necessarily incurred by him in connection with the defense of any pending or threatened action, suit or proceeding, criminal or civil, to which he is or may be made a party by reason of being or having been such trustee, director, officer or employee, provided:

1.  He is adjudicated or determined not to have been negligent or guilty of misconduct in the performance of his duty to the Corporation of which he is a trustee, director, officer or employee;

2.  He is determined to have acted in good faith in what he reasonably believed to be the best interest of such corporation;

3.  In any matter the subject of a criminal action, suit, or proceeding, he is determined to have had no reasonable cause to believe that his conduct was unlawful.  The determination as to (2) and (3) and, in the absence of an adjudication as to (1) by a court of competent jurisdiction, the determination as to (1) shall be made by the trustees of the indemnifying corporation acting at a meeting at which a quorum consisting of trustees who are not parties to or threatened with any such action, suit or proceeding is present.  Any trustee who is a party to or threatened with any such action, suit or proceeding shall not be qualified to vote and, if for this reason a quorum of trustees cannot be obtained to vote on such indemnification, no indemnification shall be made except as provided for in Paragraph (b) or (C) of this Section.

(B)  The Corporation may, pursuant to these articles, its regulations or any agreement authorized or a resolution adopted by the voting members at a meeting held for such purpose by the affirmative vote of a majority of the voting members present if a quorum is present, indemnify or agree to indemnify such trustee director, officer or employee against expenses, judgments, decrees, fines, penalties or amounts paid in settlement in connection with the defense of any pending or threatened action, suit or proceeding, criminal or civil, to which he is or may be made a party by

reason of being or having been such trustee, director, officer or employee, provided a determination is made by the trustees in the manner set forth in Paragraph (A) of this Section or by a majority of the voting members present at a meeting held for such purpose if a quorum is present (a) that such trustee, director, officer or employee was not, and has not been adjudicated to have been, negligent or guilty of misconduct in the performance of his duty to the corporation of which he is a trustee, director, officer or employee (b) that he acted in good faith in what he reasonably believed to be the best interest of such corporation, and (c) that, in any matter, the subject of a criminal action, suit or proceeding, he had no reasonable cause to believe that his conduct was unlawful.

(C) Such indemnification shall not be deemed exclusive of any other rights to which such trustee, director, officer or employee may be entitled under the articles, the regulations, any agreement any insurance purchased by the Corporation, vote of members or otherwise.

By letter dated February 18, 1971, respondent ruled that petitioner was exempt from Federal income tax under section 501(c)(3) and that donors may deduct contributions made to petitioner.

Petitioner's articles of incorporation authorize its trustees to adopt a code of regulations. The trustees promptly did so. Petitioner's code of regulations creates two classes of members: Charter members and associate members (individuals or organizations chosen by the board of trustees). The Club is the sole charter member of petitioner.[3] The Club elects petitioner's

---

[3] Petitioner's code of regulations draws careful distinctions between the Club and petitioner; it provides that the Club "shall be the only member in the Corporation [petitioner] entitled to vote", it requires that petitioner's trustees "must be members in good standing" of the Club, and it requires that "Each officer [of petitioner] must be a member" of
(continued...)

board of trustees at the Club's annual meeting.  The board of

trustees, which could range in size from 3 to 15 members, manages

the business of petitioner.  The board of trustees chooses

officers, including chairman of the board, executive director,

assistant director, secretary, treasurer, and one or more

assistant directors, assistant secretaries, and assistant

treasurers, who are responsible for petitioner's day-to-day

affairs.  The board of trustees makes decisions for petitioner at

monthly meetings.  The board of trustees makes expenditure

decisions at its meetings; petitioner's code of regulations does

not authorize individual officers or members--not even the

treasurer--to make expenditure decisions.

Petitioner had 11 officers during the tenure of Lawrence C.

Plants (hereinafter sometimes referred to as Plants), who was

petitioner's president[4] during its fiscal year 1984 through

---

3(...continued)
the Club.  The witnesses' and the parties' references to
membership have been in terms of membership in petitioner, and
not in the Club.  In discussing questions of control, both
parties seem to have ignored the fact that the Club, as
petitioner's only voting member, appears to control petitioner.
Also, both parties seem to have ignored any question of who
controlled the Club.  Initially, all the officers of petitioner
held more-or-less corresponding positions in the Club.  Because
the record does not include information as to who controlled the
Club during the years in issue and because the parties do not
regard the role of the Club as significant in dealing with the
issues in the instant case, we have determined to ignore the
controlling role of the Club.  Concord Consumers Housing v.
Commissioner, 89 T.C. 105, 106 n.3 (1987).

[4]     So stipulated.  Petitioner's code of regulations
(continued...)

January 1, 1985, and was a member of the board of trustees from January 1, 1985, through January 1, 1987. Thomas Wilkens (hereinafter sometimes referred to as Wilkens) was petitioner's president from January 1, 1985, through September 30, 1986. Ernest Zeve (hereinafter sometimes referred to as Zeve), a former president of petitioner, was petitioner's treasurer during the years in issue. Zeve died before the trial in the instant case.

Petitioner reported on its Forms 990 for the years in issue fundraising revenues, expenses, net income, and other income as shown in table 1.

Table 1

| Fiscal Year | Fundraising | Gross Revenues | Direct Expenses | Net Income |
|---|---|---|---|---|
| 1984 | Bingo | $473,956.63 | $402,474.28 | $71,482.35 |
| | Luncheons | 14,795.00 | 3,043.63 | 11,751.37 |
| | Reverse raffle | 12,170.00 | 6,551.75 | 5,618.25 |
| | Other events | 22,074.06 | 12,614.73 | 9,459.33 |
| | Total fundraising | 522,995.69 | 424,684.39 | 98,311.30 |

_____

[4](...continued)
provides for a chairman of the board and for an executive director, but not for a president. We note that the Club had an office of "Chief Barker", which apparently was more-or-less equivalent to both president and executive director. See supra note 3.

Other income                                                   $17,013.75

_____

| Fiscal Year | Fundraising | Gross Revenues | Direct Expenses | Net Income |
|---|---|---|---|---|
| 1985 | Bingo | $274,359.17 | $242,094.56 | $32,264.61 |
| | Greatest show | 112,548.00 | 62,715.85 | 49,832.15 |
| | Reverse raffle | 10,849.84 | 5,363.75 | 5,486.09 |
| | Other events | 24,637.26 | 8,946.60 | 15,690.66 |
| | Total fundraising | 422,394.27 | 319,120.76 | 103,273.51 |
| | Other income | | | $11,510.87 |

_____

| Fiscal Year | Fundraising | Gross Revenues | Direct Expenses | Net Income |
|---|---|---|---|---|
| 1986 | Bingo | $279,564.00 | $250,830.00 | $28,734.00 |
| | Golf outing | 5,328.00 | 3,394.00 | 1,934.00 |
| | Kids bowling for kids | 1,776.00 | 274.00 | 1,502.00 |
| | Other events | 5,240.00 | 0.00 | 5,240.00 |
| | Total fundraising | 291,908.00 | 254,498.00 | 37,410.00 |
| | Other income | | | $6,659.00 |

Table 2 shows, for each of the years in issue, the total amount of petitioner's reported charitable grants and allocations, and how much of this total was to Ohio Boys Town.

Table 2

| | Grants and Allocations | |
|---|---|---|
| Fiscal Year | Total | To Ohio Boys Town |
| 1984 | $100,846.16 | $27,550.00 |
| 1985 | 167,959.64 | 76,439.72 |

-11-

| 1986 | 40,471.00 | 38,516.00 |

In the mid-1970's, petitioner began renting the Puritas Party Center (hereinafter sometimes referred to as the Center) in Cleveland, Ohio, to conduct fundraising by operating bingo games. During 1984 and 1985 petitioner operated bingo games 2 nights a week at the Center. From November 1, 1985, through June 14, 1986, petitioner operated bingo games in a leased building in Elyria, Ohio. The latter building is hereinafter sometimes referred to as the Elyria Hall.

From 1976 through 1978, Ross Vecchio (hereinafter sometimes referred to as Vecchio) was petitioner's bingo operator. In 1978, petitioner's bingo license was revoked by the Ohio Attorney General's office for violations of bingo regulations, including improper handling of game receipts and inaccurate record keeping. The revocation was overturned on appeal. In April 1984, Vecchio pled guilty to charges of income tax evasion for 1978 stemming from illegal actions in conducting bingo games. He was sentenced to a prison term, fined $10,000, and ordered not to participate in the operation of bingo games.

At Zeve's request, Nick Popovic (hereinafter sometimes referred to as Popovic) operated petitioner's bingo games at the Center and the Elyria Hall. Popovic was a member of petitioner, but never an officer or member of the board of trustees of petitioner; he operated all of petitioner's bingo games during

the years in issue.  Popovic is a brother-in-law of Vecchio.
Petitioner's president during each of the years in issue
delegated to Zeve and Popovic the authority and duties incident
to the conduct of the bingo games.  Petitioner's procedures for
the conduct of the bingo games and for the handling of the
proceeds therefrom vested ultimate authority and responsibility
with Zeve.

During petitioner's fiscal 1984 and part of fiscal 1985
Tenth Ohio Investment (hereinafter sometimes referred to as Tenth
Ohio) leased the Center to P&R Corporation (hereinafter sometimes
referred to as P&R) at a rental of $36,000 per year, and P&R
subleased the Center to petitioner for 2 nights per week for
bingo games at a rental of $26,000 per year, $250 per bingo
session.  During the period in issue P&R was owned equally by
Zeve, Vecchio, Angelo Vecchio, Popovic, and Anthony Lanza
(hereinafter sometimes known as Lanza), and Vecchio was P&R's
president.  Lanza is a brother-in-law of Vecchio.  Vecchio signed
the lease with petitioner.

Petitioner had been leasing the Center since the mid-1970's.
During the same period, Ohio Boys Town[5] also paid $26,000 per

---

[5] Zeve was a board member and officer of Ohio Boys Town. Zeve participated in the conduct of Ohio Boys Town's bingo games. Popovic operated bingo games on behalf of Ohio Boys Town at the Center during the years in issue.

year to P&R to use the Center for its bingo games held 2 nights per week. Petitioner lost its lease for the Center in 1985.

During 1985 and 1986 Cleveland Commercial Investment Co. (hereinafter sometimes referred to as Cleveland Commercial) owned the Elyria Hall. Cleveland Commercial leased the Elyria Hall to Lanza at a rental of $26,000 per year, and Lanza subleased the Elyria Hall to petitioner for 2 nights per week for bingo games at a rental of $26,000 per year, $250 per session. Glen Snow was president of Tenth Ohio when petitioner was sublessee of the Center, and was president of Cleveland Commercial when petitioner was sublessee of the Elyria Hall.

Popovic and Zeve prepared all of petitioner's daily yellow bingo sheets, which were required by Ohio law. The daily yellow sheets are designed to show the amounts received from various types of bingo games and the amounts spent for security at a bingo game. Popovic and Zeve discussed how much of the proceeds they had collected would be reported on the daily sheets. At Zeve's direction, Popovic created multiple sets of daily sheets and adjusted the revenue and expense amounts so that the net balance would match the subsequent bank deposits.

Popovic and Zeve reported $58,965 as net receipts from the 65 bingo games held at the Elyria Hall from November 9, 1985, through June 14, 1986, to petitioner and to various State authorities. The amounts they reported did match the amounts they deposited to petitioner's bank account. These amounts were

incorporated into summary financial reports that Zeve presented orally at petitioner's monthly meetings. Petitioner's members unanimously approved these oral financial reports. However, it turned out that Zeve and Popovic had understated the net proceeds by $93,665.

Popovic and Zeve did not report on the daily yellow bingo sheets the amounts that they had diverted for renovating the Elyria Hall, nor did they inform petitioner that they were diverting bingo receipts for the renovations.

During the years in issue, Popovic owned Paint and Paper Place, a business in Avon Lake, Ohio. Paint and Paper Place issued nine invoices to petitioner, dated between June 18, 1985, and September 18, 1985, totaling $1,834.41, for paint supplies for renovating the Elyria Hall. All Electric Contractors, Inc., billed Popovic $3,767.04 for electrical work on the Elyria Hall. Swart Signs billed Popovic $60 for a Variety Club bingo sign for the Elyria Hall. AXP Rental billed Popovic $162. for unspecified rentals for the renovation of the Elyria Hall from February 7, 1986, through March 28, 1986. Popovic paid all or part of these invoices himself with money diverted from petitioner's bingo games at Zeve's direction. These invoices were neither presented to nor paid by petitioner, nor were Popovic's payments later ratified by petitioner. During the years in issue, Popovic also paid bingo funds as compensation to bingo workers. Payments to the bingo workers were not authorized or ratified by petitioner.

In 1986 Popovic directed the bingo workers to lie to the Ohio Attorney General's investigators regarding compensation paid to them.

The Elyria Police Department conducted an undercover investigation of petitioner's bingo games held in Elyria between November 8, 1985, and March 21, 1986. Accountants and investigators from the Ohio Attorney General's office monitored petitioner's bingo games held on March 14, 1986, and March 15, 1986, while the Elyria police officers were monitoring the games. Popovic and Zeve knew the Attorney General's agents were present, but did not know about the undercover police investigation. When the Attorney General's agents were present, police investigators noticed changes in the manner in which the bingo games were conducted, which changes seemed calculated to reduce the receipts from the games.

The Elyria Police Department officers and the Ohio Attorney General agents compared their findings to the report of the receipts made by petitioner, and in all cases the report of receipts by petitioner and the findings by the Elyria Police Department and the Attorney General were at variance, the receipts found by the Elyria Police Department and the Ohio Attorney General being substantially more than those reported by petitioner.

On May 5, 1986, the Common Pleas Court of Lorain County, Ohio, issued a warrant on indictment against petitioner for

illegal operation of a bingo game and commanded the Lorain County sheriff to arrest petitioner. On June 4, 1986, the grand jury of Lorain County filed an indictment against petitioner for illegal operation of a bingo game because petitioner did not use all the gross receipts of the bingo games for charitable purposes, a third degree felony. On June 5, 1986, the Lorain County Sheriff received the warrant. On June 15, 1986, the Elyria Police Department executed a valid search warrant during petitioner's bingo game, and confiscated its property, arrested and incarcerated Popovic, and closed the bingo game. On June 25, 1986, the Sheriff arrested petitioner pursuant to the May 5, 1986, warrant, by serving Zeve. Bills of particulars were filed against petitioner and against Popovic on September 11, 1986.

On November 18, 1986, petitioner, acting through Zeve, waived its rights and pleaded guilty to the lesser included offense of falsification, a first degree misdemeanor. As part of its waiver, petitioner agreed "never to conduct Bingo in State of Ohio and to forfeit property, monies and bingo supplies to a charity to be selected by agreement of the Court and counsel." On February 12, 1987, a judgment entry of conviction and sentence ($2,500 fine) was filed against petitioner. Petitioner paid the fine and court costs that day. On September 30, 1987, a judgment entry was filed in petitioner's case and another case, distributing their consensually forfeited property among nine private organizations and the Elyria Police Department.

On January 23, 1987, a judgment entry of conviction and sentence was filed against Popovic, who had pleaded guilty to the third degree felony of conducting an illegal bingo game. Popovic was sentenced to 2 years' imprisonment and a fine of $3,500. The imprisonment sentence was suspended, and Popovic was put on 5 years' probation.

Jack D. Maistros (hereinafter sometimes referred to as Maistros) represented Popovic during this criminal case. Maistros was an attorney in the same firm as John Climaco (hereinafter sometimes referred to as Climaco), petitioner's longtime counsel. Petitioner issued a check for $10,000 (which bore the notation "full and final settlement for all attorney fees") to Climaco on November 28, 1986. This check was signed by Plants and Zeve. This payment was authorized by petitioner's board of trustees.

Elio Zerbini (hereinafter sometimes referred to as Zerbini) represented petitioner during its criminal case. On August 13, 1986, petitioner paid $3,000 to Zerbini as a retainer for representing it and providing legal advice to Zeve in connection with the criminal case. This check was signed by Plants and Wilkens. Although petitioner's articles of incorporation authorize it to indemnify an officer for expenses incurred in defending against actions, suits, and proceedings, petitioner did not expressly authorize any payments to Zerbini for legal advice on behalf of Zeve.

The Attorney General of Ohio brought a civil suit against petitioner, Zeve, Popovic, and Wilkens on May 11, 1987. Climaco signed the answer filed on behalf of all four defendants in the civil suit.

The Attorney General settled the civil case with Zeve for $20,000, and received full payment. The Attorney General settled the civil case with Popovic for $37,500[6] but had not received anything on account of the settlement by the time of the trial in the instant case. The Court of Common Pleas found that Wilkens--

> delegated authority to the Defendants Nick Popovic and Ernest L. Zeve to operate the bingo games on behalf of the Defendant. Variety Club Tent No. 6 Charities, Inc., that he was president of the Defendant; that he relied on the accuracy of their reports, and that he was as careful in the discharge of his duties in overseeing the operation of the games as any reasonable president of a sponsoring organization would be under the circumstances then and there prevailing.

The Court of Common Pleas thereupon rendered judgment for Wilkens.

As to petitioner, the Court of Common Pleas found that the receipts from the bingo games that petitioner conducted at the Elyria Hall were underreported, and that "the receipts from the games available to be distributed to charity is $131,505", and ordered petitioner to pay that amount to the Clerk of Courts.

---

[6]     So stipulated. The judgment entry in the Court of Common Pleas, filed Dec. 5, 1991, noted the settlements and ordered Zeve and Popovic each to pay $20,000.

On August 6, 1985, petitioner's board of trustees authorized a payment of $2,500 to Ohio Boys Town to set up Elyria Hall for bingo games and to buy equipment that Ohio Boys Town could use in operating bingo games in Elyria Hall. Pursuant to this authorization, petitioner gave a $2,500 check, dated August 6, 1985, to Ohio Boys Town. The check was signed by Plants and Zeve. Ohio Boys Town determined that it would not conduct bingo games at Elyria Hall. It endorsed the check in blank, and Popovic then endorsed the check in blank. On September 7, 1985, the check was deposited by AmeriTrust Co. to an account at the Cuyahoga Savings Association.

For each year in issue, petitioner filed a Form 990 disclosing its income, expenses, and other organizational and financial information. Petitioner failed to disclose in its 1984 or 1985 Forms 990 that it was leasing property from P&R, a corporation with which a principal officer of petitioner was affiliated. Petitioner failed to disclose on its 1986 Form 990 that it had paid a retainer for legal services on behalf of Zeve.

On February 9, 1990, respondent issued to petitioner a final notice of revocation of the favorable ruling letter, retroactive to October 1, 1983. The determination was based on a finding that all or part of petitioner's net earnings had inured to the benefit of private shareholders or individuals. On the same day, respondent also issued to petitioner a notice of deficiency with respect to its income taxes for its fiscal 1984, 1985, and 1986.

_____

During the years in issue, Zeve and Popovic were insiders with respect to petitioner; Vecchio was not.

OPINION

I. Status Under Sec. 501(c)(3)

Section 501(a) provides that "An organization described in subsection (c) * * * shall be exempt from taxation under this subtitle".[7]

---

[7] Exceptions from this broad rule because of secs. 502 (relating to feeder organization), 503 (relating to prohibited transactions by certain categories of organizations), 501(b) (relating to unrelated business income), and various other provisions of the Code do not appear to be issues in the instant case.

In order to be described in section 501(c)(3),[8] an organization must meet all of the following criteria:  (1) it must be both (a) organized and (b) operated, exclusively[9] for certain specified exempt purposes, including charitable, educational, and scientific purposes; (2) no part of its net earnings may inure to the benefit of any private shareholder or individual; (3) no substantial part of its activities may consist

---

[8]  Sec. 501(c)(3) provides, in pertinent part, as follows:

SEC. 501. EXEMPTION FROM TAX ON CORPORATIONS, CERTAIN TRUSTS, ETC.

*    *    *    *    *    *    *

    (c) List Of Exempt Organizations.--The following organizations are referred to in subsection (a):

*    *    *    *    *    *    *

        (3) Corporations * * * organized and operated exclusively for * * * charitable * * * purposes * * *, no part of the net earnings of which inures to the benefit of any private shareholder or individual, no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation, * * * and which does not participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of any candidate for public office.

The later amendment of this provision by sec. 10711(a)(2) of the Omnibus Budget Reconciliation Act of 1987, Pub. L. 100-203, 101 Stat. 1330, 1330-464, does not affect the instant case.

[9]     "Exclusively", in this context, means that there is no nonexempt purpose that is "substantial in nature". Better Business Bureau v. United States, 326 U.S. 279, 283 (1945); Living Faith, Inc. v. Commissioner, 950 F.2d 365, 370 (7th Cir. 1991), affg. T.C. Memo. 1990-484; Stevens Bros. Foundation, Inc. v. Commissioner, 324 F.2d 633, 638 (8th Cir. 1963), affg. on this issue 39 T.C. 93, 109 n.10 (1962).

of lobbying efforts; (4) no part of its activities may constitute intervention or participation in any political campaign on behalf of any candidate for public office (sec. 501(c)(3)); and (5) its purpose must not be "contrary to a fundamental public policy". Bob Jones University v. United States, 461 U.S. 574, 592 (1983). See generally, American Campaign Academy v. Commissioner, 92 T.C. 1053, 1062-1063 (1989). These requirements are stated in the conjunctive. Petitioner's failure to satisfy any of these requirements would be fatal to its qualification under section 501(c)(3). American Campaign Academy v. Commissioner, 92 T.C. at 1062; Stevens Bros. Foundation, Inc. v. Commissioner, 39 T.C. 93, 109-110 (1962), affd. on this issue 324 F.2d 633, 637-640 (8th Cir. 1963). With a few minor differences, the organizations and requirements listed in section 170(c)(2) are virtually identical to those described in section 501(c)(3). In view of the nearly identical statutory language, the courts have applied many of the same standards in interpreting section 170(c)(2) and section 501(c)(3). See Bob Jones University v. United States, 461 U.S. at 586-587.

In the instant case, respondent contends only that petitioner's net earnings inured to the benefit of private shareholders or individuals. See supra note 1. The parties' disputes as to exempt status focus on the following:

(1) Whether Zeve, Popovic, or Vecchio was an insider with respect to petitioner.

(2) Whether any of the following constituted an inurement of petitioner's net earnings to an insider--

(a) diversions of bingo game proceeds,

(b) amounts paid to attorneys Climaco and Zerbini,

(c) a $2,500 check payable to the order of Ohio Boys Town, and

(d) rental fees paid in connection with petitioner's bingo games in the Center.

## A. Zeve, Popovic, or Vecchio as an Insider

In order for an organization to qualify for exemption under section 501(c)(3), no part of the organization's net earnings may inure to the benefit of any private shareholder or individual. Sec. 501(c)(3).

A "private shareholder or individual" is broadly defined as any person having a personal and private interest in the activities of the organization. Sec. 1.501(a)-1(c), Income Tax Regs. Such private shareholders or individuals are sometimes referred to for convenience as "insiders". See American Campaign Academy v. Commissioner, 92 T. C. at 1066; Sound Health Association v. Commissioner, 71 T.C. 158, 185-186 (1978).

On opening brief respondent contends that Zeve, Popovic, and Vecchio were insiders with respect to petitioner. However, on answering brief respondent refers only to Zeve and Popovic. Petitioner contends that Zeve, Popovic, and Vecchio are not insiders with respect to petitioner.

We agree with respondent as to Zeve and Popovic; we agree with petitioner as to Vecchio.

The term "private shareholder or individual" appears at present in sections 170(c) (three places), 501(c) (eight places), 528(c)(1)(D), 833(c)(3)(A)(vi), 2055(a), 2522 (four places), and 4421(2)(B). This term has been unchanged since the Revenue Act of 1924, Pub. L. 176, 68th Cong., 1st. Sess., ch. 234, 43 Stat. 253, 271, 282. The Revenue Act of 1921, Pub. L. 98, 67th Cong., 1st Sess., ch. 136, 42 Stat. 227, 241, 253, used the term "private stockholder or individual", as did the prior Revenue Acts back to the Tariff Act of 1913, Pub. L. 16, 63d Cong., 1st. Sess., ch. 16, 38 Stat. 114, 172. The term "private stockholder or individual" also appears in section 38 of the Tariff Act of 1909, commonly called the Corporation Excise Tax Act of 1909, Pub. L. 5, 61st. Cong., 1st Sess., ch. 6, 36 Stat. 11, 113. Neither of the parties has directed our attention to, and we have not found, any statutory explanation of any of these terms. Our examination of the legislative history of the Revenue Act of 1924 has not turned up any explanation of the shift from "stockholder" to "shareholder". We note that the Administration's proposed bill leading to the Revenue Act of 1924 retained the word "stockholder", while the bill as reported by the House Ways and Means Committee used the word "shareholder". We note also that the term "private stockholder or individual" appears in paragraph (2) of section 2055(a) (and its 1939 Code predecessor, section

812(d)), while the term "private shareholder or individual" appears in paragraph (4) of the same section 2055(a). We have not found any explanation of the intended difference between "stockholder" and "shareholder", nor any reason why "stockholder" was replaced by "shareholder" in the Revenue Act of 1924. See Western Natl. Mut. Ins. Co. v. Commissioner, 102 T.C. 338, 354 (1994), affd. 65 F.3d 90 (8th Cir. 1995).

Section 1.501(a)-1(c), Income Tax Regs., provides as follows:

> (c) "Private shareholder or individual" defined. The words "private shareholder or individual" in section 501 refer to persons having a personal and private interest in the activities of the organization.

This definition is unchanged from Regs. 65, art. 517 (1924), except that the older regulations use "individuals" and "corporation", instead of "persons" and "organization", respectively. Art. 517 of Regs. 65 is essentially similar to Regs. 45, art. 517 (1920). In general, the case law appears to have drawn a line between those who have significant control over the organization's activities and those who are unrelated third parties. United Cancer Council, Inc. v. Commissioner, 109 T.C. __, __ (1997) (slip op. at 91); People of God Community v. Commissioner, 75 T.C. 127, 133 (1980).

(1) Zeve

Zeve, a former president of petitioner, was petitioner's treasurer during the years in issue. As treasurer, he was a

member of petitioner's board of trustees. The parties have stipulated that petitioner's president during each of the years in issue delegated to Zeve and Popovic the authority and duties incident to the conduct of the bingo games, and that petitioner's procedures for the conduct of the bingo games and for the handling of the proceeds thereof vested ultimate authority and responsibility with Zeve. As shown supra table 1, bingo accounted for more than 90 percent of petitioner's gross revenues and about 60 percent of petitioner's net income during the years in issue.

Clearly, during the years in issue Zeve had a significant formal voice in petitioner's activities generally and had substantial formal and practical control over most of petitioner's income.

We conclude, and we have found, that Zeve was an insider with respect to petitioner during each of the years in issue.

(2) Popovic

Popovic operated all of petitioner's bingo games during the years in issue; he did so at Zeve's request. Petitioner's president during each of these years delegated to Zeve and Popovic the authority and duties incident to the bingo games. Although Popovic was a member of petitioner, he never was an officer or member of the board of trustees. Popovic did not have any formal voice in petitioner's activities generally. However, in his stipulated role as operator of petitioner's bingo games,

he did have some formal control and much practical control over most of petitioner's income.

Although the matter is not free from doubt, we conclude that it is more likely than not that Popovic had enough control to be an insider with respect to petitioner during each of the years in issue; we have so found.

### (3) Vecchio

Vecchio was petitioner's bingo operator from 1976 through 1978, well before the years in issue. As president and one-fifth owner of P&R, Vecchio was involved in petitioner during the years in issue only to the extent of having an interest in the sublessor of the Center, where petitioner's bingo games were being conducted during 1984 and part of 1985. The rent that petitioner paid to P&R ($26,000 per year) was less than 10 percent of petitioner's reported direct bingo expenses. Supra table 1.

On opening brief respondent states several times that Vecchio was an insider, but the only explanation given is that he "is a former president and bingo operator." We have found that Vecchio had earlier operated petitioner's bingo games, but do not find in the record evidence that he had been petitioner's president at any time. On answering brief, respondent does not even mention Vecchio.

On the basis of the record in the instant case, it appears that, during the years in issue, Vecchio did not have any formal

voice in petitioner's activities generally, that he did not have any formal control over any of petitioner's activities, and that he did not have any practical control over any of petitioner's activities.

We conclude, and we have found, that Vecchio was not an insider with respect to petitioner during any of the years in issue.

We hold in part for respondent and in part for petitioner on this issue.

## B. Did Any of Petitioner's Net Earnings Inure to Zeve or Popovic?

We consider the categories of inurement items seriatim as listed by respondent.

### (1) Diverted Bingo Proceeds

Respondent contends that Zeve and Popovic profited from petitioner's breach of its fiduciary duty to the charitable trust funds that consisted of the proceeds of the bingo games, and this constitutes an inurement of petitioner's net earnings to private individuals. Petitioner contends that (1) the skimmed bingo proceeds that Popovic used to pay for repairs, renovations, and bingo workers' compensation did not inure to insiders, and (2) inurement involves an intentional conferring of benefits, while the instant case involves theft.

We agree with petitioner's conclusion.

Zeve and Popovic worked together to skim part of the proceeds of the bingo games that Popovic operated for petitioner,

and to hide this skimming from petitioner's board of trustees by falsifying the records of the bingo operations.  Part of the skimmed funds was used for unauthorized repairs and renovations, part was used for unauthorized and illegal compensation paid to bingo workers, and part went into Zeve's and Popovic's pockets.  As petitioner puts it on brief, Zeve and Popovic were stealing petitioner's bingo proceeds, "pure and simple".

Neither side has directed our attention to any court opinion in the inurement area involving theft from an organization by an insider with respect to that organization, and our research has not led us to any such opinion.  Our research has uncovered 31 other places in the current text of the Internal Revenue Code of 1986 in which "inures", or a variant such as "inure" or "inurement", is used.  All of these uses involve charitable or other types of exempt organizations.  Most of these uses, like that in section 501(c)(3), prohibit an improper inurement, while some require that an entire item inure to the benefit of the favored organization.  None of these uses materially assists in our analysis of the circumstances, if any, in which a theft constitutes an inurement.  Also, the regulations do not deal directly with the question before us.

Although our search must be for the meaning of the statutory term, "inures",[10] we may be guided by our understanding of what

_____

[10]    See O.W. Holmes, "The Theory of Legal Interpretation",
(continued...)

the Congress intended that the term mean, or what the Congress intended that the term not mean. The boundaries of the term "inures" have thus far defied precise definition. As respondent points out, petitioner's suggestion that inurement means the _intentional_ conferring of a benefit cannot be allowed to mean that there is no inurement unless "all the organizations' officers and board members have actual knowledge of, and affirmatively act to cause, the prohibited benefit." By the same token, we do not believe that the Congress intended that a charity must lose its exempt status merely because a president or a treasurer or an executive director of a charity has skimmed or embezzled or otherwise stolen from the charity, at least where the charity has a real-world existence apart from the thieving official.

We conclude that petitioner had such a real-world existence, see _supra_ tables 1 and 2, and that Zeve's and Popovic's thefts from petitioner were not inurements of petitioner's net earnings.

We hold for petitioner on this issue.

(2A) Attorney's Fees--Climaco

Respondent notes that petitioner paid $10,000 to Climaco on November 28, 1986, that a complaint was filed against petitioner, Zeve, Popovic, and Wilkens on May 11, 1987, and that Climaco

---

[10](...continued)
12 Harv. L. Rev. 417, 419 (1899). ("We do not inquire what the legislature meant; we ask only what the statute means.")

answered the complaint on behalf of petitioner and the three individuals. Relying on Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947), respondent contends that the November 28, 1986, payment to Climaco was for Climaco's representation in connection with the answer Climaco filed to the May 11, 1987, complaint, and that this constitutes an inurement to Zeve and Popovic.

Petitioner maintains that the $10,000 payment to Climaco was to compromise Climaco's claim for "over $25,000 in legal fees for matters he had handled over the years", unrelated to any criminal proceedings against Zeve or Popovic, and unrelated to the defense of the May 11, 1987, civil suit, which was not even filed until about 5½ months after the $10,000 payment.

We agree with petitioner's conclusion.

The period of years in issue ends on September 30, 1986. The $10,000 payment to Climaco was made nearly 2 months later. Respondent contends the payment was for Climaco's work in filing an answer to a suit the complaint in which was filed almost 7½ months after the end of the period before us.

We conclude that, whether the payment was for future services in part to Zeve and Popovic, as respondent contends, or for prior unrelated services to petitioner, as petitioner contends, petitioner's payment to Climaco was not an inurement of petitioner's net earnings to any private shareholder or individual for any period in issue in the instant case. Under

these circumstances we do not need to determine which side's stated view of the facts is more likely to be correct.

We hold for petitioner on this issue.[11]

(2B) Attorney's Fees--Zerbini

Respondent notes that petitioner paid $3,000 to Zerbini on August 13, 1986, for Zerbini's representation in the already-unfolding criminal case. Relying on petitioner's admission in a trial memorandum and the Wichita Terminal Elevator Co. doctrine, respondent contends that part of this payment was for Zerbini's representation of Zeve in the criminal case. Respondent asserts that "petitioner's payment of legal fees on behalf of its individual members and officers acting in their private capacity constitutes private inurement."

On brief, petitioner acknowledges that "Zerbini did provide some legal advice to Zeve in conjunction with the proceedings against Petitioner," but contends that "Petitioner did not pay Zerbini for any legal advice given to Zeve." Petitioner points out that "No criminal proceedings were ever instituted against * * * Zeve." Petitioner contends that the payment to Zerbini was merely one of the "Ordinary and necessary expenses made in

---

[11]    We do not make any determination or state any conclusion in the instant opinion as to how Climaco's joint representation of petitioner, Zeve, and Popovic in the 1987 civil proceeding might affect petitioner's tax status for years after the last of the years in issue in the instant case.

furtherance of Petitioner's charitable purposes" and thus does "not constitute any part of its 'net' earnings."

We agree with respondent.

Unlike the situation as to the payment to Climaco, the subject payment to Zerbini was made during the last of the years in issue and was made on account of Zerbini's services in a criminal proceeding that had gone to indictment, at least against petitioner, during the last of the years in issue. Thus, the Zerbini payment differs from the Climaco payment in a critical respect.

As we have supra noted in the Findings of Fact, petitioner's articles of incorporation provide that petitioner "shall" indemnify a trustee or officer against expenses incurred "in connection with defense of any pending or threatened action * * * to which he is or may be made a party by reason of" the person being a trustee or officer, but only if three listed conditions have been satisfied, as follows: (1) The person was determined not to have been negligent or guilty of misconduct toward petitioner, (2) the person was determined to have acted in good faith, and (3) in a criminal proceeding, the person was determined to have had no reasonable cause to believe that the person's conduct was unlawful. These articles further provide that either petitioner or its voting members (see supra note 3) may so indemnify, or agree to indemnify, "provided a determination is made by the trustees * * * or by a majority of

the voting members" that all three of the listed conditions have been satisfied.  Art. Ninth (B).

Petitioner's amended trial memorandum, filed at the trial, states that Plants will testify as follows:

> that the $3,000 paid to Elio Zerbini, Esq. represented payment for legal services rendered to Petitioner and its Treasurer, Ernie Zeve, in conjunction with the criminal proceedings; that Petitioner was authorized to pay for said legal services rendered to Ernie Zeve * * *.

This same memorandum states as follows in the summary of facts portion:

> Although Respondent has not specifically stated that it believes that the payment of legal fees to Elio Zerbini, Esq. constituted prohibited private inurement, Respondent has also questioned the payment of $3,000.00 to Elio Zerbini by check no. 717, dated August 13, 1986, in discovery in this action.  As that payment represents payment for legal services rendered to Petitioner and to Petitioner's Treasurer, Ernie Zeve, in conjunction with the criminal charges against Petitioner described above, that payment also constituted an ordinary, necessary and reasonable expense of Petitioner made in furtherance of its purposes.

Finally, this same memorandum states as follows in the expected witnesses portion:

> 3.  Elio Zerbini, Esq., who will testify that he is an attorney at law who represented Petitioner in the Lorain County Court of Common Pleas upon the criminal charge of failing to use all of the receipts of Petitioner's bingo games for charitable purposes or permissible expenses and that the $3,000.00 which Petitioner paid to him represented legal fees for his representation of Petitioner only.

The parties stipulated that Zerbini represented Zeve as well as petitioner in the criminal case.  Plants testified that the $3,000 payment to Zerbini was solely for Zerbini to represent petitioner in the criminal case, and that petitioner did not pay

Zerbini to represent Zeve in the criminal case. This is contrary to petitioner's representations as to the facts, as made in petitioner's amended trial memorandum. Petitioner did not make any of the determinations that its articles of incorporation require, in considerable procedural and substantive detail (see supra in the Findings of Fact), before petitioner may indemnify or agree to indemnify Zeve for the criminal case expenses.

Petitioner represented in the amended trial memorandum that Zerbini would testify that petitioner's $3,000 payment "represented legal fees for his representation of Petitioner only." Petitioner did not call Zerbini as a witness. In light of the fact that petitioner created the uncertainty in the record herein as to whether it had paid Zerbini in part to represent Zeve in the criminal proceeding, it should have been obvious that it was important to clarify the matter. Petitioner seemed to recognize this by listing Zerbini in the amended trial memorandum and describing Zerbini's expected testimony on this point. In the final analysis, petitioner chose not to call Zerbini, and he did not testify. We are entitled to, and we do, infer that if Zerbini had testified, then his testimony would have been unfavorable to petitioner on this issue. O'Dwyer v. Commissioner, 266 F.2d 575, 584 (4th Cir. 1959), affg. 28 T.C. 698, 703 (1957); Stoumen v. Commissioner, 208 F.2d 903, 907 (3d Cir. 1953), affg. a Memorandum Opinion of this Court dated March

13, 1953; <u>Wichita Terminal Elevator Co. v. Commissioner</u>, 6 T.C. at 1165.

Petitioner contended at trial and contends on brief that it could not have admitted that it paid Zerbini to represent Zeve as well as itself, because "Respondent filed no requests for admissions in this action".  As we explained at trial, when respondent offered petitioner's trial memorandum into evidence, although petitioner's statements in the trial memorandum are not "admissions" in the sense of Rule 90, Tax Court Rules of Practice and Procedure, those statements are "admissions" in the sense of Fed. R. Evid. 801(d)(2).  Those statements are not excludable as hearsay, they are relevant, and they may be received into evidence unless they are excludable for some other reason. Petitioner has not shown another reason for exclusion.  We received the statements and have described <u>supra</u> their effect on our analysis.

We conclude from the foregoing that it is more likely than not that petitioner's payment of $3,000 to Zerbini was to secure Zerbini's representation of both Zeve and petitioner.  We have so found.

Petitioner did not follow the procedure prescribed by its articles of incorporation for indemnifying an officer.  Thus, the net effect of the transaction was that petitioner paid a private expense of Zeve.  We conclude that this constitutes an inurement

of petitioner's net earnings to a private shareholder or individual in petitioner's fiscal 1986.

We hold for respondent on this issue.

(3) Check to Ohio Boys Town

Petitioner gave a $2,500 check to Ohio Boys Town. Ohio Boys Town endorsed the check in blank. Popovic endorsed the check in blank. AmeriTrust Co. deposited the check. The record does not show who actually received the money, but both sides assume that Popovic did. It appears that the check, or the proceeds of the check, should have gone back to petitioner. The record does not show why the money did not go back to petitioner.

Respondent contends that the $2,500 was not a charitable contribution by petitioner, but rather was an inurement to Popovic. But any taking by Popovic in this context would have been an unauthorized taking, essentially a theft similar to the bingo proceeds skimming that Popovic and Zeve engaged in. For the reasons set forth supra under (1) Diverted Bingo Proceeds, we conclude that such a diversion of the $2,500 check to Ohio Boys Town is not an inurement of net earnings.

We hold for petitioner on this issue.

(4) Bingo Rental Payments for the Center

Respondent contends that petitioner's fiscal 1984 and 1985 payments of $250 per bingo session to P&R as rental for the Center constitute inurements of net earnings to Zeve and Popovic, who were part owners of P&R. Petitioner maintains that it had to

pay rent for a hall to conduct its bingo games and contends that, under Ohio law, the $250 per session that it paid was a reasonable rent.

We agree with respondent.

An organization's payment of reasonable rent to an insider for the organization's use of the insider's property would not constitute inurement of net earnings but payment of an excessive amount in the form of rent would. Founding Church of Scientology v. United States, 188 Ct. Cl. 490, 412 F.2d 1197, 1202 (1969); Texas Trade School v. Commissioner, 272 F.2d 168, 169 (5th Cir. 1959), affg. 30 T.C. 642, 647 (1958).[12] Whether the payment in question exceeds a reasonable rental is a question of fact. Harmon City, Inc. v. United States, 733 F.2d 1381, 1385 (10th Cir. 1984); Southeastern Canteen Co. v. Commissioner, 410 F.2d 615, 619 (6th Cir. 1969), affg. on this issue and revg. on another issue T.C. Memo. 1967-183.

During petitioner's fiscal 1984 and part of fiscal 1985 petitioner paid $250 per bingo session to P&R to rent the Center for bingo fundraising. We have held that Zeve and Popovic are insiders, in particular with regard to petitioner's bingo fundraising activities. Zeve and Popovic each owned 20 percent of P&R. If petitioner was paying more than reasonable rent to

---

[12] To the same effect is Bramson v. Commissioner, T.C. Memo. 1986-273.

P&R for the Center, then it appears that there is inurement of petitioner's net earnings to Zeve and Popovic.[13]

The record includes practically no evidence as to the reasonableness of the $250 rental for the Center. Petitioner directs our attention to only two items, as follows:

> 1) Under Section 2915.09(A)(3) of the Ohio Revised Code, a rental rate of $250.00 per session is a reasonable rate for a bingo hall (tr.12-13); and 2) in the decision of the Lorain County Court of Common Pleas in the civil action (Ex. AW, at p.5), the court expressly allowed a deduction of $250.00 per session for the rental of Petitioner's bingo hall [the Elyria Hall].

(A) Ohio Statute. The cited Ohio statute, section 2915.09(A)(3), Ohio Revised Code,[14] does not provide that $250

---

[13] Petitioner contends that the $250 rent is reasonable; petitioner does not contend that the existence of P&R as a corporation, or the fact that Zeve and Popovic together have only a minority interest in P&R, affects the determination of whether there is an inurement of petitioner's net earnings to Zeve and Popovic.

[14] Sec. 2915.09, Ohio Revised Code, provided in pertinent part as follows for the years in issue:

> Sec. 2915.09.(A) A charitable organization that conducts a bingo game shall:

> * * * * * * *

> (3) Conduct the bingo game on premises owned by the charitable organization, premises owned by another charitable organization and leased from that charitable organization for a rental rate not in excess of two hundred fifty dollars per bingo session, or premises leased from a person other than a charitable organization for a rental rate that is not more than is customary and reasonable for premises that are similar in location, size, and quality but not in excess of two hundred fifty dollars per bingo session. * * *

(continued...)

per bingo session is a reasonable rate for a bingo hall.  Rather, it provides that a charitable organization is not permitted to pay "more than is customary and reasonable for premises that are similar in location, size, and quality", with an absolute cap of $250 per bingo session.  It remains the situation, under the statute, that a $250 per bingo session rental would be forbidden if that exceeds the amount that "is customary and reasonable for premises that are similar in location, size, and quality".

The evidence of the cited statute does not make it more likely that the $250 rental payments for the Center were reasonable rental payments, than would be the case if we did not have the statute.  Thus, although the statute is an interesting part of the background, by itself the statute does not even rise to the level of being relevant to the issue of whether the $250 rental payments for the Center were reasonable rental payments. Fed. R. Evid. 401.

---

[14](...continued)

\* \* \* \* \* \* \*

(E) Whoever violates division (A)(2) of this section is guilty of illegally conducting a bingo game, a felony of the third degree.  Whoever violates division (A)(1), (3), (4), or (5), or (B), or (C) of this section is guilty of a minor misdemeanor.  If the offender has previously been convicted of a violation of division (A)(1), (3), (4), or (5), or (B), or (C) of this section, a violation of division (A)(1), (3), (4), or (5), or (B), or (C) of this section is a misdemeanor of the first degree.

Later amendments of this provision, changing the $250 amounts to $450, do not affect the years in issue.

(B) <u>The Elyria Hall</u>. It may be that, the determination of the Lorain County Court of Common Pleas in the civil action is a determination that (or, at least, evidence that) $250 is a reasonable rental for the Elyria Hall. If it were coupled with evidence as to the comparative location, size, and quality of Elyria Hall and the Center, then this evidence could well provide a basis for a finding as to the reasonableness of the $250 rental payments for the Center. However, we have not found, and the parties have not directed our attention to, any such connecting bits of evidence in the record in the instant case.

Accordingly, we conclude that the record in the instant case does not provide any basis for concluding that the $250 rental payments for the Center were or were not in excess of a reasonable rental. Thus petitioner has failed to carry its burden of proving that these payments did not constitute an inurement of petitioner's net earnings to Zeve and Popovic during petitioner's fiscal 1984 and fiscal 1985.

We hold for respondent on this issue.

<u>(5) Conclusion</u>

As a result of our holdings as to the payments to Zerbini in petitioner's fiscal 1986 and the payments for the Center in petitioner's fiscal 1984 and 1985, we conclude that there were inurements of petitioner's net earnings to insiders in each of the years in issue. Petitioner does not contend that these

inurements should be treated as applying to only parts of these years.

We hold, for respondent, that petitioner violated the inurement prohibition in section 501(c)(3) in each of the years in issue.

II. Retroactivity of Respondent's Revocation of the Prior Favorable Ruling Letter Issued to Petitioner

Petitioner contends that, under section 601.201(n)(6), Statement of Procedural Rules, it was improper for respondent to revoke the prior favorable ruling letter retroactively to October 1, 1983.

Respondent relies on the broad statutory discretion under section 7805(b) and contends that petitioner operated in a manner materially different from that originally represented, thus justifying the retroactivity of the revocation.

We agree with respondent.

The Supreme Court has held that respondent has broad discretion under section 7805(b)[15] and its predecessor, in

---

[15] Sec. 7805(b) provides as follows:

SEC. 7805. RULES AND REGULATIONS.

\* \* \* \* \* \* \*

(b) Retroactivity of Regulations or Rulings.--The Secretary may prescribe the extent, if any, to which any ruling or regulation, relating to the internal revenue laws, shall be applied without retroactive effect.

(continued...)

deciding to revoke a ruling retroactively, and that such a determination is reviewable by the courts only for abuse of that discretion. <u>Automobile Club v. Commissioner</u>, 353 U.S. 180, 184 (1957); see <u>Dixon v. United States</u>, 381 U.S. 68 (1965). See generally, <u>Virginia Education Fund v. Commissioner</u>, 85 T.C. 743 (1985), affd. 799 F.2d 903 (4th Cir. 1986).

More recently, in a different but analogous setting, we described review of exercise of discretion as follows:

> Whether the Commissioner has abused his discretion is a question of fact. <u>Buzzetta Construction Corp. v. Commissioner</u>, 92 T.C. 641, 649 (1989); <u>Estate of Gardner v. Commissioner</u>, 82 T.C. 989, 1000 (1984). In reviewing the Commissioner's actions, however, we do not substitute our judgment for the Commissioner's, nor do we permit taxpayers to carry their burden of proof by a mere preponderance of

---

[15](...continued)
This provision was extensively revised by sec. 1101(a) of the Taxpayer Bill of Rights 2, Pub. L. 104-168, 110 Stat. 1452, 1468 (1996), effective for regulations which relate to statutory provisions enacted after July 30, 1996, and so does not affect the instant case. We note that present sec. 7805(b)(8) provides as follows:

SEC. 7805. RULES AND REGULATIONS.

* * * * * * *

(b) Retroactivity of Regulations.--

* * * * * * *

(8) Application to rulings.--The Secretary may prescribe the extent, if any, to which any ruling (including any judicial decision or any administrative determination other than by regulation) relating to the internal revenue laws shall be applied without retroactive effect.

the evidence.  Buzzetta Construction Corp. v. Commissioner, 92 T.C. at 648; Mailman v. Commissioner, 91 T.C. 1079, 1084 (1988); Pulver Roofing Co. v. Commissioner, 70 T.C. 1001, 1011 (1978).  Taxpayers are required to clearly show that the Commissioner's action was arbitrary, capricious, or without sound basis in fact.  Knight-Ridder Newspapers v. United States, 743 F.2d 781, 788 (11th Cir. 1984); Mailman v. Commissioner, 91 T.C. at 1084; Drazen v. Commissioner, 34 T.C. 1070, 1076 (1960).  [Capitol Federal Savings & Loan v. Commissioner, 96 T.C. 204, 213 (1991).]

Petitioner's application for the favorable ruling letter that it received from respondent represented that no part of its net income would inure to the benefit of any private shareholder or individual.  Petitioner's articles of incorporation are to the same effect, but reserve the exceptions that it is permitted to (1) pay reasonable compensation for service and (2) make payments and distributions in furtherance of its charitable purposes.  On the basis of a record which is woefully inadequate on these particular points, we have held that (a) there was an inurement in petitioner's fiscal 1986 when petitioner paid Zerbini to provide legal services to Zeve, and (b) there were inurements in petitioner's fiscal 1984 and 1985 because petitioner failed to carry its burden of proving that it did not overpay P&R (owned 20 percent by Zeve and 20 percent by Popovic) for renting the Center.  Our holdings on inurement in the instant case are in effect holdings that, in each of the years in issue, petitioner "operated in a manner materially different from that originally represented", within the meaning of section 601.201(n)(6), Statement of Procedural Rules.

We note that, if the revocation, which occurred years after the last of the years in issue, had been made prospective only, then the revocation would have been little more than a meaningless act.

We conclude that (1) the retroactivity of the revocation is not an abuse of discretion when tested by section 7805(b), and (2) the retroactivity is not an abuse of discretion when tested by section 601.201(n)(6), Statement of Procedural Rules.  See Capitol Federal Savings & Loan v. Commissioner, 96 T.C. at 217-219, 223.

We hold for respondent on this issue.  To take into account the foregoing and petitioner's concession noted supra in note 1.

Decision will be entered

for respondent.